IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ZEPHERINE MILLER, ADMINISTRATOR and PERSONAL REPRESENTATIVE OF THE ESTATE OF RAYMOND LAMAR BAILEY, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>(1) THE GEO GROUP, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>) JURY TRIAL DEMANDED<br>) ATTORNEY LEIN CLAIMED<br>)<br>) |

## COMPLAINT

Plaintiff, Zepherine Miller, as the Administrator and Personal Representative of the Estate of Raymond Lamar Bailey, Deceased, by and through her attorneys, Kent Eldridge and Guinise Marshall Eldridge of KENT ELDRIDGE P.C., and for her claims against the Defendant for constitutional torts and gross negligence, under the Oklahoma Tort Claims Act, 51 O.S. Section 151 et.seq., alleges and states as follows:

## I. INTRODUCTORY STATEMENT

1.    This civil rights action is brought under 42 U.S.C. § 1983 to address the actions of all Defendants who were deliberately indifferent to the serious safety and medical and mental health needs of the decedent, Raymond Lamar Bailey ("Bailey"). Defendant's' deliberate indifference caused Bailey extreme emotional distress, pain, suffering, and untimely death while in custody at the Lawton Correctional and Rehabilitation Facility ("LCRF"), a private prison operated by Defendant The GEO Group, Inc. ("GEO").

2.    Raymond Lamar Bailey (Bailey) died on January 31, 2023, from at least three of the sharp force injury wounds to the head penetrated the underlying skull bone: one to the left side,

entering the inner table of the skull, one to the right back aspect of the head and one to the right

side, at least three of the sharp force injury wounds to the head penetrated the underlying skull

bone: one to the left side, entering the inner table of the skull, one to the right back aspect of the

head and one to the right side of the head, multiple incised wounds injured the face and ears,

one stab wound to the left ear, multiple stab wounds are in the neck, front, sides and back some

near the cervical column and stab wounds to the neck and right jugular vein and more.

3.      During the killing, several other inmates who were housed with Bailey contacted prison

officials on their communication pads, called for help of the correctional officers and contacted

the inmate advocates, who then called the Warden, to advise them that a killing was in process.

Additionally, security cameras were documenting the deliberate indifference of the staff at GEO

Group.    There was no help for Bailey and he was found hog-tied, deceased, partially

dismembered and disposed of in a garbage can in Unit 4 Alpha Pod at Lawton Correctional and

Rehabilitation Facility.

## II. PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Zepherine Miller is the sister of Raymond Bailey and is the duly appointed

Administrator of the Estate of Raymond Bailey, Deceased.    At the time of the events set forth

herein, Raymond Bailey was an inmate in the custody of The GEO Group, being held at the Lawton

Correctional and Rehabilitation Facility ("LCRF"), a private prison operated by The GEO Group,

Inc., located in Lawton, Oklahoma.

5.      Defendant The GEO Group, Inc. ("GEO") is a for-profit Florida corporation

headquartered in Boca Raton, Florida. GEO owns and operates LCRF under a contract or contracts

with the Department of Corrections for the State of Oklahoma ("OKDOC"). The OKDOC pays

GEO an estimated $40-50 million annually to operate LCRF. GEO's common stock is publicly

traded on the New York Stock Exchange (NYSE: GEO). According to a recent Form 10-K filed

with the Securities and Exchange Commission, GEO recorded revenue in excess of $2.42 billion in 2024. GEO was responsible for ensuring the safety and well-being of inmates detained and housed at LCRF, acts and omissions complained of occurred in Comanche County, Oklahoma which is located within the Western District of Oklahoma of the United States District Court.

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection and redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, and 43 U.S.C. § 1985, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color state of law.

7.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 since the claims form part of the same case and controversy arising under the United States Constitution and federal law.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Bailey's claims occurred in this District.

### III. FACTUAL ALLEGATIONS OF BAILEY'S DEATH

8.      Plaintiff incorporates all previous allegations, all subsequent allegations and all exhibits referenced herein to each expressly and are included by reference.  In that vein, Plaintiff states and further alleges and incorporates the following:

9.       Defendant GEO specializes in the ownership and management of for-profit private correctional detention centers within the United States and around the world.

10.      Defendant GEO's correctional detention management services provide them the unique distinction of being highly specialized in providing security, rehabilitation and protection to inmates while at their facilities, such as The Lawton Correctional and Rehabilitation Facility.

11.     Defendant GEO, as a correctional and rehabilitation facility, owes a unique duty to protect inmates with the goal of rehabilitating them to become productive members of society.

12.     Defendant GEO entered into a contract with the State of Oklahoma for the management and operation of their Lawton facility and at all relevant times to this action was obligated to perform certain duties pursuant to its contract in accordance with Oklahoma law and policy.

13.     On October 26, 2023, Raymond Lamar Bailey, an inmate at the Lawton Correctional and Rehabilitation Facility, was killed by at least one inmate and the cause of death noted by the Medical Examiner was multiple traumas due to at least sharp force, blunt force, ligatures and gaging due to an assault, with no evidence of acute intervention for multiple traumas.  The findings of the Medical Examiner are attached hereto as Exhibit 1. Mr. Bailey was killed by another inmate during the "killing hours" of 5:00 o'clock a.m. and 7:00 o'clock a.m. at the Lawton Correctional Center, where no counts are conducted by GEO.   Raymond Lamar Bailey was hogtied, gagged, stabbed and killed in his cell, and his body was placed in a garbage can, taken from Cell 203, and placed by the pod door at 7:54 a.m. by two inmates.

14.     Correctional Officers Daniel Tucker, Sadie Eilers and Nathan Allgood were the officers assigned to Housing Unit 4, where Bailey was housed.  According to the investigation of the Inspector General of the Oklahoma Department of Corrections, Correctional Officer Allgood let the inmate suspected of murder out of his assigned cell on Charlie Pod into the Alpha Pod at approximately 5:00 o'clock a.m.  At approximately 5:03 a.m. the pod door opens, and the inmate suspected of murder enters A Pod.  At 5:08 o'clock a.m., two inmates enter Bailey's Cell 203 and place a dark blanket on the door.  At 7:53 a.m. two inmates carry the trash can, that appears heavy, downstairs from Cell 203.  At 7:54 a.m. the trash can is placed by the Pod Door.  Despite calls from inmates, inmate advocates, and family members of inmates to the facility advising the

4

Warden of the assault and death of Bailey, while the assault and killing was in progress, no Correctional Officer responded and no count was made which would have led to the discovery of Bailey, perhaps in time for emergency medical intervention to have occurred. Bailey's body was not discovered by the employees, agents or the correctional officers until approximately 9:57 a.m.

15,    Robert Foust, Agent in Charge for the Oklahoma Office of the Inspector General, received a phone call from Bailey's sister, stating that she had been notified by an inmate that the Correctional Officer, who was on duty the night of inmate Bailey's death, intentionally let an inmate into Housing Unit 4 Alpha Pod where Bailey was killed. These calls were made before Bailey's body was discovered at 9:57 a.m.

15.    The Lawton Correctional Facility has a closed-circuit camera system which is monitored live by the employees, agents, representatives, guards and/or correctional officers. The agents, employees, guards, and correctional officers witnessed the events which led to Bailey's death and did nothing to intervene in contravention to the duty to ensure the protection of the inmates. In the alternative, the agents, employees, guards and correctional officers failed in their duty to monitor the closed-circuit television footage in real time which prevented said personnel from fulfilling their Constitutional duty of security and against cruel and unusual punishment.

## A. ALLEGATIONS ESTABLISHING GROSS NEGLIGENCE AND RELATED TORTS UNDER THE OKLAHOMA GOVERMENTAL TORT CLAIMS ACT

16.    The Oklahoma Department of Corrections knew about the failures of its agent, the GEO Group, however it failed correct the policies, customs and procedures which deprived Raymond Lamar Bailey of the constitutional protections guaranteed by the Constitution of the United States and Constitution of the State of Oklahoma.

17.    Because of GEO's violent history, the Oklahoma Department of Corrections had previously cited GEO Group with failure and noncompliance with the safety procedures which

were intended to protect the health, safety and welfare of the inmates, because GEO's non-compliance had resulted in the death and serious injury of at least ten inmates, before the death of Raymond Lamar Bailey.

18.    Despite the tens of millions of dollars paid to GEO Group by the Oklahoma Department of Corrections, GEO maintained constitutionally deficient safety practices which is evident by the actions of GEO deliberate indifference to the safety, security and medical needs of its inmates, the State of Oklahoma by and through the Department of Corrections, continued to engage a contractual relationship with the private mega prison, GEO Group.

**B. ALLEGATIONS ESTABLISHING DELIBERATE INDIFFERNCE BY GEO GROUP**

19.    In a letter dated April 23, 2024, entitled "Notice to Cure; Failure/Non-compliance Count and Security Check Procedures from the James Rudek, Chief Administrator, Community & Contract Services / Private Prisons, to the GEO group the following language is found:

> In 2023 there were three inmate deaths at LCRF in which investigative findings indicated that appropriate counts and/or security checks were not conducted. One occurred on March 21, 2023 (1023-191 one occurred on May 6, 2023 (IG23-322 and 1023-323), and one occurred on October 26, 2023 (IG 23470 and IG23-77
>
> Contract Monitor reviews have repeatedly found that during count times, inmates are getting out of their cells, moving around the pod* and taking showers. Counts frequently do not clear and an excessive amount of time is taken in order to get counts to clear* This hinders facility operations, including inmate recreation time, the ability to participate in programs, and other facility operations. Monitors have also found periods of time when there are no Correctional Officers or other staff on pods for extended periods of time when counts and/or security checks should have been conducted. Counts and accurate log entries are critical security activities that are routinely not completed at LCRF in violation of the above-cited policies, It has also been noted that LCRF's facility policy security standards, set forth in LCRF040101, do not outline facility-specific requirements as required by DOC policy OP-040101.
>
> Section 5.1 of the Contract, entitled "Operation", requires the contractor to "operate the Facility in accordance with this Contract and the Operating Standards." Section 5.16 of the Contract entitled "Security and Control", requires the Contractor to "provide adequate security with respect to the offenders in accordance with the

6

Operating Standards." There is zero tolerance for failing to comply with applicable policies. Corrective action to ensure compliance with the procedures established by ODOC oæ040101, LCF-040101, and LCF-040103 is expected immediately. The plan should outline actions required to ensure that facility counts are conducted as specified and that documentation of all activities that occur on housing units are accurately recorded in the designated logbook(s). The plan should define who is responsible for this process, and it should include the facility's check and balance accountability process to confirm that the plan is in practice, and in accordance with said standards. The plan should also include revised facility policies which include local procedures for facility count times.

See Exhibit 2, Attached.

20.    Despite the severity of the deficiencies, the Department of Corrections was not concerned with the medical, safety or security needs of its inmates, the Department of Corrections did not terminate the contract with GEO Group.   Instead, it was concerned solely with the monetary damages which it could extract from GEO for continued deficiencies stating:

Due to the severity of contract Non-Performance and ongoing failure to comply with operating standards, further violations of the above-cited contract provisions and policies will result in liquidated damages/withholding of funds under Section 10.3. of the Contract, entitled "Liquidated Damages Non-Performance Penalties." Liquidated damages will be assessed in the amounts designated in Appendix C of the contract and will be based on each day of the breach from the day ODOC staff first reported non-compliance of the standards.

Your corrective action plan is due to my office no later than May 23, 2024.

## C. GEO MAINTAINED A CUSTOM, POLICY, OR PRACTICE AND HISTORY OF DELIBERATE INDIFFERENCE

21.    The customs, policies and procedures identified by the Community Corrections & Contract Services letter dated April 23, 2024, are the causal connection for the injuries, loss of life and loss of property suffered by Raymond Lamar Bailey.   Those customs, policies, and procedures are included but not limited to the policies cited in the letter of April 23, 2024 and is included as "Exhibit 2", and are adopted herein by reference.

22.    Defendant had a history of deliberate indifference with regard to the medical, safety, and security needs of its inmates.    The history of deliberate indifference is acknowledged in the letter of April 23, 2024.  News reports show that there has been a pattern and practice of failing to protect inmates from assaults dating all the way back to 2009 while the facility has been under the control of Defendant GEO.

23.    In 2009, the Warden of the facility told the Associated Press that, "there have never been so many deaths reported in such a short period of time", after a fourth stabbing had occurred that week. In 2018, news reports show that two inmates were stabbed after they were able to gain access to another inmate without supervision. In January of 2020, another inmate was found stabbed and was pronounced dead at Defendant GEO's facility after the attacker gained access to the inmate without supervision.

24.    In May of 2021, there was another report of another attack on an inmate at Defendant GEO's facility after the attacker was able to gain access to an inmate without supervision.

25    News reports show that on June 29, 2022, a group of prisoners attacked two other prisoners inside their own cells while at the Defendant GEO's facility. These attackers were able to gain access to the inmate without supervision. In 2024, video shows Detention Officers allowing inmates access to other inmates from separate pods without checking their credentials, which show the pattern continues today.

26.    The Oklahoma Department of Corrections Director, Stephen Harpe, stated publicly that they "recognize that this facility's reputation for violence has got to stop."

27.    In a June 2024 press release, The GEO Group admitted that for the last four years that they have had issues with staffing shortages and staff recruitment and retention at all of their state correctional facilities.

28.    In addition to GEO's own statements, the Oklahoma Department of Corrections issued a formal statement criticizing the GEO Group's Lawton Correctional and Rehabilitation Facility. The Department of Corrections stated that over the last four years, despite receiving an increase in funding, "their operations have not improved - being the most violent prison in Oklahoma - - and continues to lack the standard of care expected by ODOC."

29.    Governor Stitt additionally issued a statement regarding the same time period, stating that "It became clear that the private prison run by Geo was not keeping prisoners safe."

30.    Defendant GEO, under the Eighth Amendment to the United States Constitution, owed a duty to Plaintiff to provide humane conditions of confinement, including taking reasonable measures to guarantee the safety of himself and other inmates.

30.    Based upon the allegations in this Complaint, Defendant GEO is liable under 42 U.S.C. § 1983 for violating Mr. Bailey's rights under the Eighth Amendment to the United States Constitution.

31.    Defendant GEO's Lawton facility has a reputation of being one of the most violent facilities within the state and Defendant persists in it's unconstitutional policies and procedures. These include a facility that lacks working doors and locks on many cells, permitting inmates to move freely between pods; ignoring specific threats unless physical violence has already occurred; failing to maintain personnel to monitor cameras; failure to maintain working security cameras; failing to appropriately discipline correction officers for failing to properly secure inmates within

their pods; and failing to perform counts are practices, procedures, policies and customs which are the causal connection to the death of Ramond Lamar Bailey.

32.    GEO Group knew their customs, policies and procedures were constitutionally deficient and knew that its practices and customs violated Plaintiff's right to be protected from violence while serving out his sentence.

32.    Defendant GEO's deprivation of the Constitutional rights of Plaintiff's decedent, resulted in mental and physical pain and suffering and death to Bailey.

## IV. CLAIMS FOR RELIEF

### A.  DEPRIVIATION OF FEDERAL CIVIL RIGHTS
### 42 U.S.C. § 1983- *Monell*  LIABILITY

33.    Defendant GEO is a "person" for purposes of 42 U.S.C. § 1983.

34.    Defendant GEO, as owner and operator of a private prison, acted under color of state law, is charged with implementing policies with respect to the medical health of its inmates, their safety and security and has a responsibility to adequately hire, train, and supervise its employees, including the individual actors named herein to assure that GEO provides constitutionally adequate care and safety for its inmates.

35.    The Eight Amendment's cruel and unusual punishment clause "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F. 3d. 912, 916 (10th Cir. 2008).  The deliberate indifference to an inmate's safety and medical needs by a private prison or its employees violates the Eighth Amendment.

36.    GEO as the contractor with the Oklahoma Department of Corrections, implements, maintains, and imposes its corporate policies, practice, protocols and customs at Lawton Correctional and Rehabilitation Facility.

37.     GEO is the official policy maker for the facility at Lawton Rehabilitation and Correctional Facility and the moving force behind the constitutional deprivations suffered by Bailey.

38.     Defendant GEO failed to properly supervise, monitor and train its correctional staff and had unconstitutional widespread, policies, practices, patterns and customs with respect to the safety of its inmates as evidenced by the letter of April 23, 2024, from the Department of Corrections to GEO.  (Exhibit 2).

39.     The acts and omissions of GEO by policy, pattern, custom, or practice are causally related to the injuries complained of herein and rise to the level of a constitutional violation under municipal liability theory.

40.     There is an affirmative causal link between the deliberate indifference to Bailey's serious medical needs, his safety, the violation of his civil rights and ultimately his death, to the customs, policies and practices carried out by GEO.

41.     Defendant GEO knew or should have known, that its policies, practices, customs and procedures posed substantial risk to the health and safety of its inmates, including Bailey.

42.     Defendant GEO failed to take reasonable steps to alleviate those risks due to deliberate indifference to inmates, including Bailey.

43.     As a result of the conduct of GEO, as described herein, the decedent suffered damages in the form of mental, physical, emotional pain and violent death in violation of his rights under the Eighth Amendment and in violation of the Civil Rights Act of 1981, 432 U.S.C. § 1983 and is entitled to actual and compensatory damages in excess of Seventy-Five-Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bring this action, and a reasonable attorney's fee and any and all such further relief as is available, just and equitable.

44.     Further, the conduct of Defendant GEO was willful, wanton, malicious, shocking to the conscience, exhibiting the required deliberate indifference, and intended to induce lawlessness, terrorize and cause harm to Bailey and therefore warrants imposition of exemplary damages against Defendant GEO.

## B. VIOLATION OF OKLAHOMA GOVERMENTAL TORT CLAIMS ACT

45.     Plaintiff has exhausted her administrative remedies under Governmental Tort Claims Act of Oklahoma 51. O.S. § 151 et. seq.

46.     The conduct described above is extreme, outrageous and caused pain, suffering, severe emotional distress and the death of Raymond Lamar Bailey.

47.     As a result of the intentional and reckless actions of Defendant by and through its agents, employees, correctional officers and other staff, which can only be described as extreme and outrageous, Plaintiff is entitled to damages under Oklahoma's Wrongful Death Statute, 12 OK § 12-1053, et.seq. in the form of medical and burial expenses, economic loss, grief, anxiety, mental pain, anguish and the loss of anticipated services suffered by Plaintiff all in excess of Seventy-Five-Thousand Dollars ($75,000.00). Plaintiff further seeks an award of punitive or exemplary damages against Defendant.

## V. PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendant for actual and compensatory damages, punitive damages, the costs of this action, a reasonable attorney's fee, interest as provided by the law, and all other further relief this Court deems just and proper.

/s/ Guinise Marshall Eldridge
KENT ELDRIDGE, OBA #2663
GUINISE MARSHALL ELDRIDGE, OBA 13902
*Attorneys for Plaintiff*
PO BOX 607
OKLAHOMA CITY, OKLA. 73101
Phone: (405) 235-6565  Fax: (405) 260-9569
kent@kenteldridge.com/guinise@kenteldridge.com

BOARD OF MEDICOLEGAL INVESTIGATIONS
## OFFICE OF THE CHIEF MEDICAL EXAMINER

Central Office
921 N.E. 23rd St
Oklahoma City, OK  73105
(405) 239-7141  Phone – (405) 239-2430  Fax

Eastern Division
1627 Southwest Blvd.
Tulsa, Oklahoma 74107
(918) 295-3400 Phone –  (918) 585-1549 Fax

OFFICE USE ONLY

Re _____ Co _____

I hereby certify that this is a true
and correct copy of the original
document.  Valid only when copy
bears imprint of the office seal.

By _____
Date _____

## REPORT OF INVESTIGATION BY MEDICAL EXAMINER

| DECEDENT First-Middle-Last Names (Please avoid use of initials)<br>RAYMOND  LAMAR  BAILEY | Age<br>44 | Birth Date<br>11/4/1978 | Race<br>BLACK | Sex<br>M |
|---|---|---|---|---|

**HOME ADDRESS - No. - Street, City, State**
8607 FLOWER MOUND, LAWTON, OK

| EXAMINER NOTIFIED BY - NAME - TITLE (AGENCY, INSTITUTION, OR ADDRESS)<br>AGENT TOMMY STRANAHAN, OFFICE OF INSPECTOR GENERAL-DOC | DATE<br>10/26/2023 | TIME<br>11:34 |
|---|---|---|

| | CITY | COUNTY | TYPE OF PREMISES | DATE | TIME |
|---|---|---|---|---|---|
| INJURED OR BECAME ILL AT (ADDRESS)<br>8607 FLOWER MOUND | LAWTON | COMANCHE | PRISON | Unknown | Unknown |
| LOCATION OF DEATH<br>LAWTON CORRECTIONAL FACILITY | LAWTON | COMANCHE | PRISON | 10/26/2023<br>FOUND | 10:20<br>FOUND |
| BODY VIEWED BY MEDICAL EXAMINER<br>921 NORTHEAST 23RD | OKLAHOMA CITY | OKLAHOMA | AUTOPSY LAB | 10/27/2023 | 10:00 |

TRANSPORTATION INJURY    ☐ DRIVER    ☐ PASSENGER    ☐ PEDESTRIAN

TYPE OF VEHICLE:    ☐ AUTOMOBILE    ☐ LIGHT TRUCK    ☐ HEAVY TRUCK    ☐ BICYCLE    ☐ MOTORCYCLE    ☐ OTHER:

| DESCRIPTION OF BODY | RIGOR | LIVOR | EXTERNAL OBSERVATION | | NOSE | MOUTH | EARS |
|---|---|---|---|---|---|---|---|
| EXTERNAL PHYSICAL EXAMINATION | Jaw ☐ Complete<br>Neck ☐ Absent<br>Arms ☐ Passing<br>Legs ☐ Passed<br>☐ Decomposed | ☑ Color PALE<br>☐ Lateral<br>☐ Posterior<br>☐ Anterior<br>☐ Regional | Beard YES          Hair _____<br>Eyes: Color BROWN      Mustache YES<br>Opacities _____<br>Pupils: R 4 MM    L 4 MM<br>Body Length 63 IN.    Body Weight 126 LBS. | BLOOD<br>OTHER<br>GAG IN MOUTH | ☑<br>☐ | ☑<br>☑ | ☑<br>☐ |

Significant observations and injury documentations - (Please use space below)
CLOTHED ADULT MALE WITH NO EVIDENCE OF ACUTE INTERVENTION FOR MULTIPLE TRAUMA.

EXHIBIT
1
tabbies

| Probable Cause of Death: | Manner of Death: | Case disposition: |
|---|---|---|

*Probable Cause of Death:*

**MULTIPLE TRAUMA**

Due To: **AT LEAST SHARP FORCE, BLUNT FORCE, LIGATURES AND GAGGING**

Due To: **ASSAULT**

*Other significant conditions contributing to death (but not resulting in the underlying cause given)*

*Manner of Death:*

Natural ☐    Accident ☐

Suicide ☐    Homicide ☑

Unknown ☐    Pending ☐

Not Assigned ☐

Case disposition:

Autopsy    YES

Authorized by    INAS YACOUB M.D.

Pathologist    INAS YACOUB M.D.

Not a medical examiner case ☐

---

**MEDICAL EXAMINER:**

Name, and Address:

INAS YACOUB M.D.

921 N.E. 23rd ST

OKLAHOMA CITY, OK  73105

GME-1 (REV 7-19)

I hereby state that, after receiving notice of the death described herein, I conducted an investigation as to the cause and manner of death, as required by law, and that the facts contained herein regarding such death are true and correct to the best of my knowledge.

Signature of Medical Examiner          INAS YACOUB M.D.

Computer generated report

10/26/2023
Date Case Initiated

11/9/2023
Date Case Finalize

Case Number:  **2306742**

Page 1 of 1



Board of Medicolegal Investigations
**Office of the Chief Medical Examiner**
921 N.E. 23rd St
Oklahoma City, OK 73105
(405) 239-7141 Phone
(405) 239-2430 Fax

**CERTIFICATION**
I hereby certify that this document is a
true and correct copy of the original
document. Valid only when copy
bears imprint of the office seal.

By_____

Date_____

# REPORT OF AUTOPSY

| Decedent | Age | Birth Date | Race | Sex | Case No |
|---|---|---|---|---|---|
| **RAYMOND LAMAR BAILEY** | **44** | **11/4/1978** | **BL** | **M** | **2306742** |

| Type of death | Means | ID By | Authority for Autopsy |
|---|---|---|---|
| **In custody; violent** | **Assault** | **Fingerprints** | **INAS YACOUB, M.D.** |

Present at Autopsy
**Shawn Nichols, Marisa Parman, Austin Wright, Jessica Gary**

## FINDINGS

1. Clear plastic bag, containing four (4) small empty milk cartons, covering the body

2. Clothed body in a fetal position with a fabric gag in mouth and fabric ligatures tied in knots securing the feet and tying the hands behind the back

3. No evidence of acute medical intervention

4. Petechiae in both eyes

5. Acute multiple sharp force injuries in the form of incised and stab wounds mainly to the head, neck, upper torso and back with internal and external bleeding and air in the head, neck, and soft tissues

6. Acute blunt force injuries to the head with resultant bone fracture of the face and lower jaw

7. No injuries consistent with defense wounds seen

8. No broken off piece of weapon remaining in the body seen on radiology

9. Randox screen negative

10. Approximately 2.5 cm meningioma on upper aspect of left frontal/parietal aspect of brain. Fibrous adhesions in the pleural and peritoneal cavities, incidental

**CAUSE OF DEATH:   MULTIPLE TRAUMA DUE TO:    AT LEAST SHARP FORCE, BLUNT FORCE, LIGATURES AND GAGGING DUE TO:    ASSAULT**

CASE NO.: 2306742

## MANNER OF DEATH: HOMICIDE

The facts stated herein are true and correct to the best of my knowledge and belief.

*[signature]*, M.D.

| | | |
|---|---|---|
| INAS YACOUB, M.D. | Pathologist | |

| OCME Central Division | 10/27/2023 10:00 AM |
|---|---|
| Location of Autopsy | Date and Time of Autopsy |

CME-2    Page 1

The body is received in a sealed bag #1947077.

## EXTERNAL EXAMINATION

DESCRIPTION

| Height | Weight | Eyes | Pupils | Opacities, Etc. | Hair | Beard/Mustache | Circumcised |
|---|---|---|---|---|---|---|---|
| 63 in. | 126 lbs. | Brown | R= L=4 mm | | Shaved head | Yes/Yes | Yes |

| RIGOR (jaw, neck, back, legs, arm, chest, abd., complete) | LIVOR (color, anterior, posterior, lateral, regional) | Body Heat |
|---|---|---|
| Full/passing | Pale | Cool |

## DESCRIPTION OF CLOTHING:

The decedent is received with the following items:

- A large clear plastic bag covering the body. Four (4) empty, small milk cartons are inside this bag: one the right upper aspect of the decedent, one on the left upper aspect, and two under the upper aspect of his back.

- A "RUSSELL" brand long-sleeved gray sweatshirt with an "INMATE" black inscription on the upper back. This garment is extensively blood-stained and has numerous cuts on the upper front and back aspect roughly overlying cuts on the underlying undershirt and the decedent's body. A white label with the inscription "Bailey, Raymond 280281" is on the left upper front aspect.

- A short-sleeved white T-shirt with a black "INMATE" inscription on the upper back. This garment is extensively stained with blood and has multiple cuts on the upper front and back roughly overlying sharp force injuries on the decedent.

- A gray pair of "RUSSEL" brand pants that appear to have been cut off and hemmed into shorts and had pockets sewn into them. The pants/shorts are blood-stained, pulled down, and tied around the ankles. A white label with the inscription "Bailey, Raymond 280281" is on the left upper front aspect of the pants/shorts.

- A blood-stained pair of boxer undershorts

2

CASE NO.: 2306742

- A white pair of blood-stained socks

- Fabric ligatures are tied around both ankles, tied both hands behind the back and a fabric gag is in the mouth

A blood-stained folded paper with printed material is in the body bag. Abundant blood is noted on the body, in the clear plastic bag, and in the body bag.

## EXTERNAL EXAMINATION:

The body is that of a well-developed adult male with no evidence of acute medical intervention for acute multiple injuries. Blunt force injuries, incised and stab wounds are noted on the head, neck, upper torso and back. Examination of the decedent's head reveals bilateral conjunctival petechiae and no petechiae seen on the face. Blood is observed in the nose, mouth, and ears. Examination of the nose does not otherwise reveal remarkable findings. Examination of the mouth reveals natural teeth, intact frenula and no other injury to the lips or gums except for multiple open wounds on the mucosa of the upper and lower lips. Examination of the head does not otherwise reveal remarkable findings.

Examination of the neck does not otherwise reveal remarkable findings. Notably, no masses, scars, or curvilinear abrasions are noted.

Examination of the chest and abdomen reveals a large surgical scar on the upper front aspect of the abdomen with two irregular scars on the right and left upper aspect of the abdomen. Examination of the chest, abdomen, and genitalia does not otherwise reveal remarkable findings.

Examination of the lower extremities reveals an old scar on the lower inner aspect of the right ankle.

Examination of the upper extremities reveals a tattoo on the left arm, front of the left forearm, back of the left forearm/wrist and front of the right forearm. Two small wounds about 1.5 cm apart are noted on the front of the left forearm. The fingernails do not appear broken. No wounds consistent with defense type wounds are noted on the hands.

Examination of the back reveals tattoos on the upper and lower back. Apart from injuries to be described, examination of the back does not otherwise reveal remarkable findings.

## EVIDENCE OF ACUTE MEDICAL TREATMENT:

None.

## EVIDENCE OF INJURY:

Multiple injuries and more than one type of injury are noted on the body. The types of injuries and the numbers do not necessarily reflect the actual order in which they occurred but are for the purpose of description. None of the injuries appear pale to support that they occurred postmortem.

I.      Tied ligatures around both hands securing them behind the back. Tied ligatures around both ankles. Fabric gag in mouth. Petechiae in both eyes.

II.     Acute blunt force trauma to the head with resultant 5 cm laceration to the right side of the forehead/eyebrow, 1x1 cm red brown abrasion on the right side of the forehead, fracture of the right side of the lower jaw, mucosal injuries to the lips and contused fractures of the cricoid cartilage of the neck with red hemorrhage in the left vocal cords

III.    Acute sharp force trauma with resultant numerous incised and stab wounds to the head, face, nose, neck, upper chest, upper back, lower back and back of right hip. The stab wounds ranged from superficial to 11 cm in depth. Two of the stab wounds entered the nose cartilage.

**EVIDENCE OF INJURY (cont'd):**

At least three of the sharp force injury wounds to the head penetrated the underlying skull bone: one to the left side, entering the inner table of the skull, one to the right back aspect of the head and one to the right side of the head. The location and appearance of these wounds are documented by photographs. Multiple incised wounds injured the face and ears. One stab wound to the left ear appear patterned.

Multiple stab wounds are in the neck, front, sides and back some near the cervical column with underlying hemorrhage but no apparent bleeding in the cervical spinal canal itself although air is noted on radiology of the cervical spine and in the head and soft tissues.

One of the stab wounds to the neck damaged the right jugular vein but the carotid arteries appear intact.

One stab entered the upper left chest cavity damaging the upper lobe of the left lung, collapsing the lung, and resulting in left hemothorax (about 50 ccs of measured remaining left hemothorax).

One wound to the lower back entered the left chest cavity just to the left of the 11th thoracic vertebra.

Some of the wounds appeared small like a poke, some wounds measured 1 cm, 2 cm, 2.5 cm in length and ranged in depth from superficial to 11 cm in depth.

No broken tip of instrument inflicting these wounds could be identified on radiology.

Several of the sharp force wounds on the torso perforated at least one or two layers of clothing fabric to reach the body.

CASE NO.: 2306742

## GROSS EXAMINATION

---

The body is examined through the customary "Y" shaped incision. No other contusions are observed in the skin and panniculus of the anterior and lateral aspect of the chest and abdomen. The 1.5 cm subcutaneous fat is normally distributed, somewhat moist, and bright yellow. The musculature through the chest and abdomen is rubbery, pale maroon, and otherwise grossly unremarkable. The sternum is examined in the usual fashion. The organs of the chest and abdomen appear pale. The gallbladder is not identified. Extensive gray fibrous adhesions are noted in the peritoneal cavity and between intestinal loops. Some gray fibrous adhesions are noted in the pleural cavities. The left lung is collapsed from sharp force injury described to the left upper lobe and left lower back. The organs are otherwise in the normal position and relationship. The liver edge is just at the right costal margin at the midclavicular line. The diaphragm is intact bilaterally. The lining of the pericardium, parietal pleura, and peritoneum is otherwise smooth and glistening. No other adhesions or abnormal accumulations of fluid are noted in the pericardial, pleural, or peritoneal cavities except for the 50 cc left hemothorax from the stab wounds to the torso.

**THYMUS:**

No significant tissue is identified grossly.

**NECK ORGANS:**

The skin and the panniculus of the anterior and lateral aspects of the neck are examined after the heart is grossly examined. Red areas of hemorrhage are noted deep to the sharp force injuries to the neck and in the strap muscles of the neck as well as on the thyrohyoid membrane and where the cricoid cartilage is acutely broken and in the posterior neck muscles deep to the stab wounds. No other areas of hemorrhage are noted. The pale maroon rubbery muscles of the anterior and lateral aspects of the neck are examined. No other injuries are observed in these muscles. The neck structures are in the midline and are freely movable. The tongue is intact, normally papillated, and without evidence of tumor or contusion or bite marks but has dark brown vomit on its surface. The hyoid bone is intact. Red hemorrhage is noted in the left vocal cords with some swelling. The cricoid cartilage is bilaterally broken with red hemorrhage. The epiglottis is plate-like with no evidence of edema, trauma, or other gross pathology but has petechiae and dark brown aspirated material is noted in the lumen of the airway. The 19 Gm pale pink-brown thyroid gland is symmetrical and has no gross lesions. The right vocal cords, folds, and respiratory lining in the larynx are unremarkable except for dark brown aspirated material in the lumen of the airways, petechiae on the mucosa and some swelling with red hemorrhage in the left vocal cords. No other material is observed in the airways. There are no petechiae of the thyroid capsule.

**CARDIOVASCULAR SYSTEM:**

The heart weighs 256 Gms. The epicardial surfaces are smooth and glistening. The heart has the normal configuration and location. The coronary vessels arise and distribute normally with no significant atherosclerosis. The coronary ostia are normally located and widely patent. The chambers and atrial

appendages are unremarkable. The valves are normally formed, and measure as follows: tricuspid = 12.5 cm, pulmonary = 8 cm, mitral = 11 cm, and aortic = 6.5 cm. The endocardium is smooth, gray, and glistening with a few subendocardial petechiae in the left ventricle. The myocardium is pale brown with no other areas of hemorrhage, masses, or discoloration. The right ventricle measures 0.3 cm; the left ventricle measures 1.2 cm; the interventricular septum measures 1.2 cm. The papillary muscles and chordae tendineae are intact and unremarkable. The major vessels arising from the heart arise in the usual fashion. No thromboemboli are observed in the main pulmonary artery. The major vessels arising from the aorta arise in the usual fashion and their orifices are not narrowed. The aorta (arch, thoracic and abdominal) is unremarkable. The inferior vena cava is unremarkable.


## PULMONARY SYSTEM:

The right lung weighs 230 Gms. and the stabbed left weighs 249 Gms. Apart from a small hemorrhagic area in the upper lobe of the left lung with the left hemothorax, the visceral pleurae are smooth, glistening, and otherwise intact with no significant anthracosis or bleb formation. The trachea, bronchi, and bronchioles have a smooth pink lining with no petechiae or gross lesions, but the lumen contains some dark brown aspirated material. The pulmonary arterial tree is free of thrombo-emboli. The parenchyma is otherwise uniformly spongy, varies from pale pink anteriorly to purple posteriorly, and exudes some frothy edema fluid from its cut surfaces. There is no other evidence of trauma, granulomatous, or neoplastic disease. The hilar lymph nodes are unremarkable in size, color, and consistency.


## GASTROINTESTINAL SYSTEM:

The esophagus has a smooth pale mucosa and no gross lesions but has some dark brown contents in the lumen. The gastroesophageal junction is otherwise unremarkable. The stomach is of normal configuration, is lined by an intact mucosa, has an unremarkable wall and serosa, and contains 250 cc of dark brown contents including recognizable pieces of carrots, white rice, and tan to brown food. The duodenum is patent, shows an unremarkable mucosa and no evidence of acute or chronic ulceration. The jejunum and ileum are otherwise unremarkable and contain tan viscid fluid proximally and green-brown contents distally. There is no Meckel's diverticulum. The ileocecal valve is intact and unremarkable. The appendix is unremarkable. The colon is examined segmentally and shows no evidence of diverticulitis, neoplasm, or trauma. The large intestine contains brown, semi-formed stools. The anus and rectum are unremarkable.

## LIVER AND GALLBLADDER:

The 862 Gm liver has an intact capsule with fibrous adhesions between it and the diaphragm and intestines and a pale brown parenchyma with no gross lesions. The gallbladder bed is unremarkable.

## SPLEEN AND LYMPH NODES:

The 51 Gm spleen has an intact capsule with fibrous adhesions and a red parenchyma with gray follicles and no gross lesions. The lymph nodes do not appear enlarged.

CASE NO.: 2306742

**PANCREAS:**

The 122 Gm pancreas has a lobulated pale tan parenchyma with no gross lesions. No areas of hemorrhage, fibrosis, fat necrosis, masses or obstruction to the pancreatic duct are noted.

**ADRENAL GLANDS:**

Lie in their usual location, have thin yellow cortices and tan to gray medullae with no gross lesions.

**GENITOURINARY SYSTEM:**

The right and the left kidney weigh 89 Gms. and 81 Gms., respectively. Both are configurated normally with no gross abnormality. The surfaces are smooth. The parenchyma is pale pink-brown. The pale cortices, medulla, calyces, pelves, ureters and urinary bladder are unremarkable. The urinary bladder contains 6 cc of slightly cloudy yellow urine. The prostate is symmetric, rubbery, gray-tan and unremarkable. The prostatic urethra is unremarkable. The testes are bilaterally present and show no evidence of tumor, trauma, or inflammation. The investing membranes are unremarkable, as is the epididymis.

**RIBS AND PELVIS:**

Intact.

**VERTEBRAE:**

Intact grossly, but the sharp force trauma to the neck introduced air into the cervical canal and intracranial cavity.

**BRAIN AND MENINGES:**

The scalp is reflected through the customary intermastoid incision and shows areas of hemorrhage deep to the sharp force and blunt force injuries described. The calvarium is removed using an oscillating saw and apart from the penetrating injuries to the left side of the head, right back of the head and right side of the head from the sharp force injury to the head, is otherwise intact without evidence of other fractures or osseous disease. No areas of epidural hemorrhage are present. An area of red subarachnoid hemorrhage is noted on the ventral aspect of the right frontal lobe. The leptomeninges are smooth and glistening except for an approximately 2.5 cm apparent meningioma attached to the left side of the dura and resting on the left medial aspect of the frontal/parietal area of the brain. The brain weighs 1225 Gms. The gyri do not appear swollen and there is no apparent tendency toward obliteration of the sulci. The cranial nerves and circle of Willis are unremarkable. Multiple sections of the cerebral hemispheres, midbrain, pons, medulla, and cerebellum do not otherwise reveal remarkable findings. The ventricular system is symmetric and unremarkable. The dura is examined. No base of the skull fractures is present.

**BONE MARROW:**

CASE NO.: 2306742

Moist and red.  Unremarkable.

## MICROSCOPIC EXAMINATION

Red subarachnoid hemorrhage is noted in the section from the ventral aspect of the right frontal lobe (slide 1). The lesion from the left dura overlying the frontal parietal region of left cerebral hemisphere is histologically a meningioma (slide 1). The pituitary gland section (slide 1) is unremarkable.

Red hemorrhage, without an inflammatory reaction, is noted in the sections from the muscles and soft tissues of the left side of the neck (slide 2). Red hemorrhage, tissue damage and micro-organisms, without an inflammatory reaction, are noted in the sections from the muscles of the right side of the neck (slide 3).

Red hemorrhage, tissue damage and no apparent inflammatory reaction are noted in the section of the left vocal cords (slide 4).

Red hemorrhage, without an inflammatory reaction, is noted in the sections of the stabbed upper lobe of the left lung and the section from the stabbed back (slide 5).

The liver section is unremarkable.  Autolysis is noted in the sections of the pancreas and kidney. (Slide 5).

IY

10/30/2023
11/2/202

INAS YACOUB, M.D.

**BOARD OF MEDICOLEGAL INVESTIGATIONS**

**OFFICE OF THE CHIEF MEDICAL EXAMINER**

921 N.E. 23rd St
Oklahoma City, OK  73105

**REPORT OF LABORATORY ANALYSIS**

| OFFICE USE ONLY |
|---|
| Re. _____  Co. _____ |
| hereby certify that this is a true and correct copy of the original document.  Valid only when copy bear im-print by the office seal. |
| By _____ |
| Date _____ |

ME CASE NUMBER: 2306742

LABORATORY NUMBER:  235162

DATE RECEIVED:          10/30/2023

DECEDENT'S NAME:     RAYMOND LAMAR BAILEY

HOLD STATUS:   5 YEARS

MATERIAL SUBMITTED: BLOOD, VITREOUS, URINE, LIVER, BRAIN, GASTRIC

SUBMITTED BY:     MARISA  PARMAN

MEDICAL EXAMINER:   INAS  YACOUB M.D.

**NOTES:** ____ NO TOXICOLOGICAL ANALYSIS REQUESTED

**ETHYL ALCOHOL:**

  Blood:

  Vitreous:

  Other:

**CARBON MONOXIDE**

  Blood:

**TESTS PERFORMED:**

**RESULTS:**

_10/31/2023_

DATE

ANGELICA HARPER, PhD., Forensic Toxicologist



J. Kevin Stitt
Governor

**OKLAHOMA Corrections**

Steven Harpe
Director

April 23, 2024

Amber Martin, Vice President
Contract Administration
The GEO Group, Inc.
621 N.W. 53rd Street Suite 700
Boca Raton, FL 33487

David Cole, Warden
Lawton Correctional Facility
8607 SE Flower Mound Road
Lawton, Oklahoma 73501

RE:    **Notice to Cure; Failure/Non-compliance Count and Security Check Procedures**

Dear Ms. Martin and Warden Cole:

The Oklahoma Department of Corrections has determined that the GEO Group, Inc. has failed to perform specific provisions of the FY24 contract between the Oklahoma Department of Corrections and the GEO Group Inc. The Oklahoma Department of Corrections will assess liquidated damages for non-performance of the contract if immediate corrective action is not taken. The contractual violations are listed and described below:

**Section 5.1 Operation.**  The Contractor shall operate the Facility in accordance with this Contract and the Operating Standards. Any change in the normal operations plan shall be submitted and approved by the Department before implementation.
**Section 5.16  Security and Control.**  The contractor shall provide adequate security with respect to the offenders in accordance with the Operating Standards.

**Appendix A - DEPARTMENT & DIVISION POLICIES AND DIRECTIVES APPLICABLE TO CONTRACTOR**

**OP-040101  Facility Security Standards**

EXHIBIT
2

VI.  Standards for Conducting Inmate Counts (4-4187, 4-ACRS-2A-11)

A.  Count Procedures

Local procedures for inmate counts will be developed and made available to all staff responsible for supervising inmates and/or conducting counts.  Procedures will outline the following, as applicable:

1.  Facility Count Times

The frequency of inmate counts will be as follows:

a. Maximum and Medium Security

(1)  Facility counts will be conducted hourly between 2200 and 0400.

(2)  One facility count will be conducted between 0500 and 0700.

(3)  Facility counts will be conducted at 1000, 1400, and 1800.

(4)  A stand up ID count will take place at 0600 and either 2100 or 2200.  Facilities can adjust the stand up ID count time upon approval of the appropriate administrator of Institutions /Community Corrections…

3.  Correctional personnel conducting inmate counts will see flesh and movement (e.g., the inhaling and exhaling of breath) for each inmate counted as being present, regardless of the inmate's security status. It is prohibited to utilize electronic visual devices/aids in lieu of conducted a physical count.

4.  Inmates who are not physically present, but are assigned to the facility, will be accounted for in the record with a brief notation stating their exact location and the reason for their absence.

5.  All security levels will conduct at least one count in each 24 hour period that will be designated as an ID count.  Staff conducting

the count will verify the identity of each inmate being counted with the inmate's identification badge.

B.    Records (4-4104)

Security personnel will maintain a record of all inmate counts, in accordance with OP-040103 entitled "Standards for Maintaining Logs." Any movement affecting the facility count (admissions/releases) is recorded. The facility will maintain a daily facility report that will include, at a minimum; the total number of inmates assigned, their names, identifying numbers and housing assignments.

**GEO Lawton Correctional Facility Policy and Procedure Manual and directive Applicable to Contractors**

**Security/LCF-040101 Facility Security Standards (4/2022)**

IV.    Standards for Conducting Offender Counts (5-ACI-3A-13)

A. Count Procedures

Local procedures for inmate counts will be developed and made available to all staff responsible for supervising inmates and/or conducting counts. Procedures will outline the following, as applicable:

1. Facility Count Times:

The frequency of inmate counts will be as follows:

a.    Maximum and Medium security

(1)    Facility counts will be conducted hourly between 2200 and 0400.
(2)    One facility count will be conducted between 0500 and 0700. One facility standup count will be conducted at 0600.
(3)    Facility counts will be conducted at 1000, 1400, and 1800
(4)    A stand up ID count will take place at 0600 and either 2100 or 2200. Facilities can adjust the standup ID count time upon approval of the administrator of Institutions/Community Corrections

2.    Correctional personnel conducting inmate counts will see flesh and movement (e.g., the inhaling and exhaling of breath) for each inmate counted as being present, regardless of the inmate's security status.

It is prohibited to utilize electronic visual devices/aids in lieu of conducted a physical count.

3.    All inmate counts shall be conducted independently by two individuals. If the initial counts are not in agreement, the counts will be repeated. If after the second count there is no agreement, a supervisor will be contacted. An I.D. and face count will then be conducted.

4.    Inmates who are not physically present, but are assigned to the facility, will be accounted for in the record with a brief notation stating their exact location and the reason for their absence.

5.    All security levels will conduct at least one count in each 24 hours period will be designated as an "ID Count." Staff conducting the count will verify the identity of each inmate being counted with the inmate's identification badge.

**Security/LCF-040103 Standards of Maintaining Permanent Logs (10/2021)**

I.    Permanent Logs

Permanent logs will be maintained at all posts designated by the Facility Administrator to provide documentation of all routine information, emergency situations, unusual/extraordinary events, and inventory control.

D. Log Entries

1.    Log entries will be kept, at a minimum on the following subject areas:

a.    Personnel on duty

b.    ***Inmate population and counts***

c.    Shift activities

d.    All entrance and gate traffic

e.    Use of force or chemical agents

f.    PREA announcement

g.    Any unusual occurrences

**Deficiencies:**

In 2023 there were three inmate deaths at LCRF in which investigative findings indicated that appropriate counts and/or security checks were not conducted. One occurred on March 21, 2023 (IG23-191), one occurred on May 6, 2023 (IG23-322 and IG23-323), and one occurred on October 26, 2023 (IG 23-770 and IG23-771).

Contract Monitor reviews have repeatedly found that during count times, inmates are getting out of their cells, moving around the pod, and taking showers. Counts frequently do not clear and an excessive amount of time is taken in order to get counts to clear. This hinders facility operations, including inmate recreation time, the ability to participate in programs, and other facility operations. Monitors have also found periods of time when there are no Correctional Officers or other staff on pods for extended periods of time when counts and/or security checks should have been conducted. Counts and accurate log entries are critical security activities that are routinely not completed at LCRF in violation of the above-cited policies. It has also been noted that LCRF's facility policy security standards, set forth in LCRF-040101, do not outline facility-specific requirements as required by DOC policy OP-040101.

Section 5.1 of the Contract, entitled "Operation", requires the contractor to "operate the Facility in accordance with this Contract and the Operating Standards." Section 5.16 of the Contract, entitled "Security and Control", requires the Contractor to "provide adequate security with respect to the offenders in accordance with the Operating Standards." There is zero tolerance for failing to comply with applicable policies. Corrective action to ensure compliance with the procedures established by ODOC OP-040101, LCF-040101, and LCF-040103 is expected immediately. The plan should outline actions required to ensure that facility counts are conducted as specified and that documentation of all activities that occur on housing units are accurately recorded in the designated log book(s). The plan should define who is responsible for this process, and it should include the facility's check and balance accountability process to confirm that the plan is in practice, and in accordance with said standards. The plan should also include revised facility policies which include local procedures for facility count times.

Due to the severity of contract Non-Performance and ongoing failure to comply with operating standards, further violations of the above-cited contract provisions and policies will result in liquidated damages/withholding of funds under Section 10.3. of the Contract, entitled "Liquidated Damages Non-Performance Penalties." Liquidated damages will be assessed in the amounts designated in Appendix C of the contract and will be based on each day of the breach *from* the day ODOC staff first reported non-compliance of the standards.

Your corrective action plan is due to my office no later than **May 23, 2024.**

Sincerely,

James Rudek, Chief of Administrator
Community Corrections & Contract Services / Private Prisons

JR/jr

cc:    Steven Harpe, Director
       Justin Farris, Chief of Staff
       Jason Sparks, Chief of Operations
       Kari Hawkins, General Counsel
       Natalie Cooper, Administrator
       Julie Rose, Administrative Manager

       Contract Monitors